# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: RAINTREE HEALTHCARE
CORP.,
                              *Debtor.*

SUNCREST HEALTHCARE CENTER
LLC,
                              *Appellee,*

v.

OMEGA HEALTHCARE INVESTORS,
INC.,
                              *Appellant.*

No. 03-17195

D.C. No.
CV-03-00238-ROS

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted
September 12, 2005—San Francisco, California

Filed December 14, 2005

Before: Betty B. Fletcher, John R. Gibson,* and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Gibson

*The Honorable John R. Gibson, Senior Circuit Judge, United States
Court of Appeals for the Eighth Circuit, sitting by designation.

---

**COUNSEL**

Jared G. Parker, John C. Hendricks, and Sarah L. Barnes, Stinson Morrison Hecker L.L.P., Phoenix, Arizona, for the appellant.

Scott F. Gibson, Gibson, Ferrin, & Riggs, PLC, Mesa, Arizona, for the appellee.

---

**OPINION**

GIBSON, Senior Circuit Judge:

Omega Healthcare Investors appeals the district court's judgment in favor of Suncrest Healthcare Center. The district court reversed the bankruptcy court's entry of summary judgment in an adversary proceeding brought by Omega to recover Medicare overpayments for cost reimbursements. The district court erred as a matter of law in its interpretation of a written agreement between the principals, and we reverse.

I.

Before February 29, 2000, RainTree Healthcare Corporation leased and operated a nursing home in Phoenix. On February 28, RainTree entered into a Transfer Agreement with Suncrest to transfer operation of the facility and Suncrest began leasing the premises that same day.[1] RainTree filed for

---

[1]The parties and the courts below provide different chronologies as to the lease, Transfer Agreement, and bankruptcy filing. The governing documents are undisputed and their language is clear. Suncrest signed its lease

bankruptcy on February 29. Eight months later, Omega became the owner of the property in RainTree's bankruptcy estate pursuant to a settlement approved by the bankruptcy court. Thus, while Omega is now the real party-in-interest seeking to recover the funds, RainTree is the debtor whose rights and liabilities are at issue.

A nursing home facility must enter into a provider agreement and obtain a Medicare provider number in order to be reimbursed for care given to Medicare patients. RainTree held provider number 03-5205 for the facility at issue. When Rain-Tree transferred operation of the nursing home facility to Suncrest, Suncrest accepted the automatic assignment of that provider number by operation of law. *See* 42 C.F.R. § 489.18(a)(4), (c) (2000). If Suncrest instead had chosen to apply for a new number, the nursing home could not have participated in the Medicare program while its application was pending. At the time of the transfer in late February, RainTree had outstanding requests for Medicare cost reimbursements.

On or around August 24, 2000, the federal government deposited $184,515.89 in Suncrest's account as the owner of Medicare provider number 03-5205. The deposit represented reimbursement for Medicare payments owed for services rendered in 1998. Although Suncrest held the provider number at the time of the deposit, RainTree had provided the services and was the holder in 1998 of the provider number as the operator of the facility. When Omega became the owner of RainTree's bankruptcy estate, it filed this adversary proceed-

for the premises on February 27, but the term of the lease began on February 28. RainTree (through its subsidiary SunQuest SPC, Inc.) and Suncrest (through its sole corporate member American Healthcare Associates, Inc.) agreed to transfer the nursing home facility operations at 11:59 p.m. Central Standard Time on February 28 and RainTree was to terminate its lease simultaneously with the execution of the Transfer Agreement (which was signed on February 29). RainTree filed its bankruptcy petition on February 29 at 7:20 p.m.

ing in bankruptcy court demanding that Suncrest turn over the funds. On June 24, 2002, the bankruptcy court heard argument and issued an oral ruling in favor of Omega on its motion for summary judgment. Suncrest appealed the ruling to the district court and, on October 15, 2003, the district court reversed the judgment and remanded for entry of judgment for Suncrest. Omega appeals the judgment.

## II.

We review de novo the district court's judgment in the appeal from the bankruptcy court, and apply the same de novo standard of review the district court used to review the bankruptcy court's summary judgment. *Neilson v. United States (In re Olshan)*, 356 F.3d 1078, 1083 (9th Cir. 2004). Summary judgment is to be granted if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, show that there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

This case involves a single issue. The question is whether RainTree or Suncrest was entitled to the Medicare reimbursement funds on February 29, 2000, the day RainTree filed for bankruptcy. *See Taylor v. Freeland & Kronz*, 503 U.S. 638, 642 (1992) ("When a debtor files a bankruptcy petition, all of his property becomes property of a bankruptcy estate."). The answer is dependent upon this Court's interpretation of the relevant Medicare statute and of the intent of the parties as reflected in the Transfer Agreement. Although this is a case arising in bankruptcy, the only relevant Bankruptcy Code provision is not dispositive.

[1] Omega claimed that RainTree's bankruptcy estate was entitled to the Medicare payment under 11 U.S.C. § 541(a) (2000),[2] which describes what comprises property of the

_____

[2]The 2005 amendments to the Bankruptcy Code are not applicable to this case.

bankruptcy estate. As the bankruptcy court stated, "Under § 541(a) . . . , when a debtor files [for] bankruptcy[,] all its property becomes property of a bankruptcy estate. . . . The scope of the [section] is broad and includes all tangible or intangible property. . . . [C]ontingent interests are even property of the estate." However, the statute "merely defines what interests of the debtor are transferred to the estate. It does not address the threshold questions of the existence and scope of the debtor's interest in a given asset. . . . [W]e resolve these questions by reference to nonbankruptcy law." *California v. Farmers Markets, Inc.*, 792 F.2d 1400, 1402 (9th Cir. 1986). In this case, questions as to the existence and scope of Rain-Tree's interest in the Medicare payment are resolved by federal Medicare and state contract law.

Both the bankruptcy and district courts relied on a Fifth Circuit case in reaching opposite legal conclusions regarding the impact of federal Medicare law. In *United States v. Vernon Home Health, Inc.*, 21 F.3d 693 (5th Cir. 1994), the government brought an action against the purchaser of a Medicare provider's assets seeking repayment of overpaid Medicare cost reimbursements. The company, Vernon II, had purchased the assets of its predecessor (Vernon I), which had received the Medicare overpayments. However, because Vernon II had assumed the Medicare provider number from Vernon I when the former took over operations of the home health care agency, the district court entered judgment finding Vernon II jointly and severally liable with Vernon I for overpayments. *Id.* at 694.

On appeal, Vernon II argued that it could not be held liable for the overpayments because it assumed no liabilities under the terms of the purchase agreement with Vernon I and Texas state law therefore shielded it from liability. The Fifth Circuit affirmed, holding that the rights of the United States arising under the Medicare program were determined by federal law, which preempted state corporate law. *Id.* at 696. In reaching that conclusion, the court relied on the same regulatory and

statutory provisions at issue in this case. The controlling regulation is 42 C.F.R. § 489.18 (2000). It provides: "The lease of all or part of a provider facility constitutes change of ownership of the leased portion." § 489.18(a)(4).

"When there is a change of ownership as specified in paragraph (a) of this section, the existing provider agreement will automatically be assigned to the new owner." § 489.18(c).

"An assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued. . . ." § 489.18(d).

**[2]** The cumulative effect of these subsections is that Suncrest's lease of the nursing home facility and assumption of the Medicare provider agreement made Suncrest subject to the same statutory and regulatory conditions as RainTree had been. These conditions include provisions for adjustments for over- and underpayments. 42 U.S.C. § 1395g(a) (2000). The relevant language states:

> The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid . . . the amounts so determined, with necessary adjustments on account of previously made overpayments or underpayments . . . .

In *Vernon*, the government interpreted the regulation and statute to mean that the assignee of a provider agreement is responsible to satisfy overpayments the government had made to the assignor. The Fifth Circuit described the government's interpretation as "eminently reasonable," 21 F.3d at 696, and concluded that Vernon II could have avoided liability had it applied for its own provider number instead of assuming the one held by Vernon I. Taking over the number allowed Vernon II to provide continuous service to and be reimbursed for

Medicare patients without waiting for approval of its application. *Id.*

The district court in the present case concluded that entitlement to reimbursement for underpayments automatically transfers with the provider number just as liabilities for overpayments transferred in *Vernon*. The district court rejected RainTree's argument that *Vernon* is limited to cases where the government is bringing an action for reimbursement and held that the government "need not be a party to the action for the liability to exist." The district court provided no case citation or explanation for its conclusion.

The facts in the instant case are distinct from those in *Vernon* in significant ways. This case represents a dispute between private parties over entitlement to money that the government paid because it had previously underpaid a provider. The government is not a party to this case and thus takes no position. In contrast, *Vernon* involved a direct dispute between the government and Vernon II, where Vernon II had assumed the Medicare provider number in an asset-only purchase in which Vernon II took on no liabilities. The government advanced a policy argument that suggested a quid pro quo for Vernon II's assumption of the Medicare provider number. Vernon II was able to receive Medicare payments immediately upon starting its operations because it assumed an already-approved provider number, but in return it bore the risk that it would have to share in the liability for overpayments.[3]

---

[3] A very good description of the statutory and regulatory framework of Medicare reimbursements is contained in *Sims v. United States Department of Health & Human Services (In re TLC Hospitals, Inc.)*, 224 F.3d 1008 (9th Cir. 2000). The following passage provides some context for this case:

> The Medicare statute specifies an accelerated payment system to ensure that providers are paid promptly. Under this system, a Medicare provider . . . receives periodic payments for its services on an *estimated* basis prior to an audit which determines the precise amount of reimbursement due to the provider. 42 U.S.C. § 1395g; . . . Consequently, underpayments and overpayments are an expected and inevitable result of this payment system.

*Id.* at 1011-12 (citation omitted).

**[3]** Although not mentioned by the bankruptcy or district courts or by either party, the district court order in *Vernon* (as affirmed by the Fifth Circuit) held Vernon I and Vernon II jointly and severally liable for the overpayment. *Id.* at 694. The case's noteworthy holding is that Vernon II, the successor entity that did not provide the home health care services for which Medicare overpaid, was liable for the overpayment. However, Vernon I, the entity that provided the services and received the overpayment was also held to be liable for repayment. If we apply that analysis to this case, it follows that both RainTree and Suncrest would be entitled to the Medicare funds. Viewed in that light, it is clear that Medicare laws do not define the scope and existence of RainTree's contractual interest, if any, in the Medicare payment. Instead, state contract law must provide the substantive answer.

**[4]** Under 42 C.F.R. § 489.18, Suncrest automatically became the holder of RainTree's Medicare provider number when it began leasing the nursing home facility. Omega argues that the fact of the assignment is not critical because RainTree's right to the Medicare funds is not dependent upon ownership of the provider number. Instead, Omega asserts that RainTree's interest in the unpaid Medicare funds was transferred to the bankruptcy estate because the funds were owed to the estate upon its creation. The bankruptcy statute supports Omega's argument. "[P]ost-petition revenues belong to the estate to the extent they are based on pre-petition services or agreements." *Cusano v. Klein*, 264 F.3d 936, 945 (9th Cir. 2001) (interpreting 11 U.S.C. § 541(a)(1), (6)). The Medicare payment at issue is for services RainTree rendered in 1998, well before its 2000 bankruptcy filing.

The bankruptcy court held that the Medicare regulations and statutes are not controlling and looked to Arizona contract law to determine the existence and scope of RainTree's interest in the Medicare funds as set forth in the Transfer Agreement. The district court, after holding that federal law entitles Suncrest to the funds, concluded that the Transfer Agreement

does not explicitly transfer those assets back to RainTree. The district court agreed that the parties could have contracted to transfer any Medicare reimbursement funds from Suncrest to RainTree, but the court did not read the Transfer Agreement to contain such a provision.

**[5]** We conclude that the bankruptcy court correctly interpreted the written agreement. The Transfer Agreement provides:

> Subsequent to the Effective Date, [Suncrest] shall allow [RainTree] and its agents and representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Effective Date, to the extent reasonably necessary to enable [RainTree] to . . . verify accounts receivable collections due [RainTree] and for reimbursement purposes for the cost reporting periods prior to and including the Effective Date.

RainTree also retained liability "for any and all debts owed to any third person or entity arising from the operations at the Facility prior to the Transfer Date." Applying Arizona law (as the Transfer Agreement designates as controlling), the bankruptcy court correctly determined that it was obligated to enforce the contract in accordance with the parties' intent. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1138 (Ariz. 1993) (en banc). The Arizona Supreme Court has held that intent is not limited to words in the contract but is also to be gleaned from the surrounding circumstances, such as "negotiation, prior understandings, subsequent conduct and the like." *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 682 P.2d 388, 398 (Ariz. 1984) (en banc). Courts are to determine what the parties' intentions were at the time they entered into the agreement, taking into account any agreed-

upon special meaning the parties may have given to particular words in the contract. *Taylor*, 854 P.2d at 1139.

The bankruptcy court concluded that the parties' intent was sufficiently expressed in the terms of the Transfer Agreement. The bankruptcy court stated:

> [Omega's] analysis appears supported by the agreement, where the parties specified which assets and record[s] would be turned over to the transferee. There's no indication [RainTree] intended transfer of entitlements to underpayments incurred prior to the effective date. Further, the fact that [RainTree] was entitled under the agreement to subsequently access records to file or defend cost reports, to verify accounts receivable collections, and for reimbursement purposes of cost [reporting] periods prior to and including the effective date, leads to only one reasonable interpretation, I believe. That is that the right to collect underpayments was retained by the selling party. Since [Suncrest] offered nothing to contradict this understanding, I believe that [RainTree is] entitled to summary judgment.

The bankruptcy court also noted that its conclusion that RainTree was entitled to the payment "is buttressed by the fact that the agreement provided [RainTree] will remain liable for all debts to any third person or entity arising from the operations of the facility prior to the termination date."

**[6]** The bankruptcy court put into context the reason for the access to records provision and pointed out its symmetry with the liability provision. In other words, it is reasonable for the parties to have agreed that RainTree would be entitled to Medicare reimbursements for payments dating back to its operation of the facility because RainTree was obligated by the Transfer Agreement to satisfy any shortfall that Medicare

may have assessed related to that time.[4] Moreover, Suncrest's ability to assume the ongoing operation of an established nursing home facility with a Medicare provider agreement in place was certainly adequate consideration for an agreement that RainTree would be entitled to any potential Medicare cost reimbursements dating back to RainTree's operation of the facility.

As counsel agreed at oral argument, the phrase "cost reporting period" is peculiar to the Medicare reimbursement system. *See, e.g.*, 42 C.F.R. § 413.24(f)(1) (2000) ("A provider that . . . experiences a change of ownership must file a cost report for that period under the program beginning with the first day not included in a previous cost reporting period and ending with the effective date of termination of its provider agreement or change of ownership."). The Transfer Agreement guaranteed RainTree access to records "for reimbursement purposes for the cost reporting periods prior to and including the [date of the transfer]." The bankruptcy court's conclusion is thus further supported by the parties' use of the phrase "cost reporting period," which is probative of their intention with respect to Medicare over- and underpayments.

[7] As in the bankruptcy court, Suncrest has offered no contrary contract interpretation on appeal. It advances no argument to suggest that further evidence is necessary and appropriate as to the intention of the parties or that additional documents comprise the agreement between the parties. Rather, Suncrest simply denies that the quoted provisions of the Transfer Agreement mean what the bankruptcy court said they mean. The bankruptcy court correctly interpreted the contract and relied upon that interpretation to determine that

---

[4]At oral argument, Suncrest's counsel was asked about the hypothetical situation in which Medicare had overpaid RainTree and collected that overpayment from Suncrest. Counsel conceded that, had RainTree not filed for bankruptcy, Suncrest would have tried to collect that amount from RainTree as an obligation under the Transfer Agreement.

RainTree retained full interest in the Medicare reimbursement funds, and the funds therefore are property of the bankruptcy estate.

**[8]** We reverse the district court judgment and direct that the bankruptcy court order be reinstated, and we remand the case to the district court for its ruling on Omega's motions for attorneys' fees and prejudgment interest.

Judgment REVERSED and REMANDED.